**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Case No. 24-CR-550 (EGS) |
| **v.** | |
| **AUSTIN OLSON,** | Sentencing Date: June 2, 2026 |
| **Defendant.** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The defendant, Austin Olson ("the Defendant"), drove overnight from his home in Michigan, and, on Election Day 2024, walked into the Unites States Capitol carrying a loaded flare gun, two bottles of gasoline, a torch-style lighter, an Israeli flag tied to a shoe, and a copy of a political manifesto entitled "Project Phoenix: Spread the Flame." When officers at a security screening checkpoint inquired about the contents of the bottles, the Defendant attempted to mislead them by stating that he "only ha[d] vodka in a bottle." The Defendant later told officers that he had come to the Capitol to send a message to Congress and that the torch and flare gun found in his possession were to "light up the message in fire." The Defendant was arrested before he could proceed further, and the area of the Capitol was evacuated.

The Defendant's actions caused grave danger to himself, to law enforcement, to the general public, and to the Capitol building itself. The Defendant's actions merit a substantial sentence of imprisonment. Accordingly, the Government respectfully requests that the Court impose a sentence of imprisonment for 46 months, which is the top of the applicable Guidelines range as calculated by the Government, followed by three years of supervised release. As conditions of supervised release, the government requests that the Defendant be ordered to stay away from the District of Columbia, engage in mental health treatment, comply with any medication

recommendations for mental health conditions, and engage in substance abuse testing and treatment.

**BACKGROUND**

### *The Offense*

At approximately 12:30 p.m. on Tuesday, November 5, 2024, the Defendant walked into the United States Capitol Building via the south screening facility of the U.S. Capitol Visitor Center ("CVC"). As part of a routine security procedure for visitors entering the CVC, the Defendant followed instructions to remove all belongings and place them in the designated container to pass through the X-ray machine. The Defendant placed a coat and book bag on the X-ray machine belt for screening. When the Defendant's coat passed through the X-ray machine, a United States Capitol Police ("USCP") officer saw what appeared to be a torch and a small firearm, as evidenced in the below image from the X-ray machine display:



Upon inspecting the coat and emptying the contents of the pockets, USCP officers discovered a torch and a flare gun which was loaded with a single cartridge. The flare gun was orange in color with a barrel length of less than 12 inches, was equipped with a hammer and trigger

mechanism and appeared to be functional.

As the USCP officer monitoring the X-ray machine showed the contents to fellow officers in the vicinity, he asked the Defendant to walk through the magnetometer where another officer confirmed that the Defendant had no additional items of contraband. USCP officers also screened the contents of the book bag and detected a strong odor consistent with gasoline emanating from the book bag.

One of the USCP officers conducting the security screening asked the Defendant if he had any gasoline-like products in his possession, and the Defendant responded that he "only has vodka in a bottle." USCP officers conducted a further inspection of the contents of the bag and found one transparent, standard-size (750ml) glass liquor bottle and one red metal screw top drinking container emitting a strong gasoline-like odor, both of which contained gasoline. The scene is depicted in the below still shot image from surveillance footage:



When once again questioned by officers, the Defendant only then confirmed that the bottles contained gasoline. The bottles removed from the Defendant's bag are depicted in the below photograph:



The Defendant subsequently told the USCP officers present that he was there to send a message to Congress and that the torch and flare gun found in his possession were to "light up the message in fire." Another USCP officer asked the Defendant what message he was trying to deliver to Congress. The Defendant removed a red closed envelope from under his shirt and explained that in the envelope was the message he wanted to send to Members of Congress. Inside the envelope was a twenty-six page manifesto authored by the Defendant, titled "Project Phoenix, Spread the Flame, A New Dream: Waking Up to the American Nightmare, If the spirit of democracy is an individual's right to freely choose, then democracy is dead." The cover of the manifesto is depicted in the below image:



Due to the strong odor of gasoline emanating from the Defendant, the CVC was evacuated and the area was declared hazardous. The USCP Hazardous Materials Response Team responded and rendered the area safe. The CVC was placed on lock-down beginning at approximately 12:30 p.m. and the event was cleared at approximately 2:00 p.m.

USCP officers searched the Defendant's backpack for additional items, which included two booklets containing writings, his identification card, and an Israeli flag tied to a shoe. The below photograph depicts USCP officers finding the flag in the Defendant's backpack:



A special agent with the USCP subsequently examined the flare gun. The device is an Orion brand flare gun that is capable of firing a single flare cartridge. The cartridge inside the device was also an Orion brand flare capable of burning up to seven seconds. The USCP special agent was able to cock the hammer and pull the trigger showing that the firing pin could engage and strike the primer of a cartridge if loaded. The flare gun is a device designed to expel or hurl a projectile capable of causing injury to individuals or property. Photographs of the flare gun and the cartridge that was loaded into the flare gun are depicted below:



The flame torch also appeared to be operational. The torch-style lighter recovered from the Defendant's coat is depicted in the below photograph:



USCP special agents interviewed the Defendant after his arrest. The Defendant explained that on Monday, November 4, 2024, he packed up his "Political Thesis," a flare gun, flares, two notebooks, and his backpack, and began to drive from Michigan to Washington, D.C. The Defendant stopped at a gas station in Westland, Michigan, and filled his vehicle's fuel tank, a metal water bottle, and a glass liquor bottle with gasoline. He placed the two bottles in his backpack and placed the backpack in the trunk of his vehicle. The Defendant drove through the night and arrived in Washington, D.C., in the mid-morning hours of Tuesday, November 5, 2024.

The Defendant told the special agents that he wrote his "thesis" and planned to travel to Washington, D.C. on Election Day with the intent to deliver his "thesis" to Congress and get arrested in the hope of gaining viral media attention to spread his message. The Defendant specifically stated that he chose Election Day to maximize the impact of his statement. The Defendant denied that he intended to start a fire or light himself on fire, but instead had brought the flare gun and gasoline to the U.S. Capitol, knowing it would provoke a police response and publicity.

As part of the investigation of this matter, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") conducted a series of tests at their Fire Research Laboratory using a flare gun

8

of the same make/model possessed by the Defendant at the Capitol, the same volume of gasoline brought by the Defendant, and a polyester flag made of the same material as the Israeli flag discussed above. One of the tests involved pouring various amounts of gasoline onto the test flag, then using the flare gun to light the flag/gasoline combo on fire. In a test where the ATF poured the same amount of gasoline possessed by the Defendant onto the flag, the flare gun caused the gasoline to ignite and burn, causing damage to the area around the fire, as depicted in the photographs below:



Once the gasoline was consumed, the flag generally continued to burn, but with significantly reduced energy compared to when gasoline was involved. The flame during the test (including the gasoline) reached a peak height of approximately 11 feet and was hot enough to be capable of damaging property and causing burn injuries to persons nearby.

### *Procedural History*

The Defendant was initially charged in United States District Court by Complaint on November 6, 2024, with Unlawful Activities (Carrying on the Grounds or in any of the Capitol Buildings a Firearm, Dangerous Weapon, Explosives, or an Incendiary Device), in violation of 40 U.S.C. § 5104(e)(1)(A). *See* ECF No. 1. After an initial appearance on November 7, 2024, the Defendant was released with conditions. *See* ECF No. 5.

The Defendant was indicted on December 5, 2024, by a federal grand jury in the District

of Columbia on one count of Carrying on the Grounds or in any of the Capitol Buildings a Firearm, Dangerous Weapon, Explosives, or an Incendiary Device, in violation of 40 U.S.C. § 5104(e)(1)(A). *See* ECF No. 11. On December 12, 2025, the Defendant pleaded guilty to Count One. *See* ECF No. 49.

### ***The Pre-Sentence Investigation Report***

The Presentence Investigation Report (PSIR) in this matter summarizes the Defendant's personal history.

The Defendant has a single prior conviction for Operating While Impaired on January 22, 2019, in Plymouth, Michigan. *See* PSIR at ¶37.

The Defendant was twenty-seven years old when he committed the instant offense, and is now twenty-nine years old. *See id.* at ¶ 43. He was born in Adrian, Michigan, and has been a lifelong resident of Michigan. *See id.* at ¶¶ 43 and 50. At approximately 14 years old, the Defendant went into the custody of his grandparents, who "provided him with a stable home." *Id.* at ¶ 44. The Defendant currently rents a residence with a roommate, in Detroit, Michigan, where he has lived since August 2025. *Id.* at ¶ 50.

The Defendant denied suffering from, being diagnosed with, or being treated for any mental or emotional health problems. *Id.* at ¶ 54.

The Defendant reported a history of alcohol, marijuana, and LSD use. *Id.* at ¶ 57. The Defendant reported using alcohol from age 19 (approximately 2015) through October 2024. *Id.* He reported using marijuana from age 22 (approximately 2018) through November 2024. *Id.* The Defendant acknowledged using LSD approximately three times at age 24 (approximately 2020). *Id.* Since the instant offense, the Defendant has entered a substance abuse treatment program. *See id.* at ¶ 60.

The Defendant earned a high school diploma in 2015. *Id.* at ¶ 61. He attended Wayne State University in Michigan from 2015 to 2016, where he studied business. *Id.* at ¶ 62. The Defendant then attended Schoolcraft College in 2016 in Livonia, Michigan, studying secondary education. *Id.* at ¶ 63. In approximately 2017, the Defendant briefly enrolled in Eastern Michigan University, where he again studied secondary education. *Id.* at ¶ 64.

The Defendant was employed at the time of his offense doing videography for a mixed martial arts gym. *Id.* at ¶ 69. He is currently employed at a Salvation Army Store in Michigan, where he has worked since August 2025. *Id.* at ¶ 68.

## APPLICABLE LAW

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective

11

manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –
      (A) the applicable category of offense committed by the applicable
      category of defendant as set forth in the guidelines –
            (i) issued by the Sentencing Commission . . .; and
            (ii) that, . . . are in effect on the date the defendant is sentenced; . . .

(5) any pertinent policy statement –
      (A) issued by the Sentencing Commission . . . and
      (B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with
similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even

12

acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction."); *see also United States v. Drew*, 200 F.3d 871 (D.C. Cir. 2000) (upholding the District Court's application of a cross refence to an uncharged attempted offense when sentencing on a conviction for a possessory offence).

## THE APPLICABLE SENTENCING GUIDELINES

The applicable Guidelines are contested in this matter, as the parties disagree whether a cross reference under U.S.S.G. § 2K2.5(c) is applicable.[1] The estimated calculations in the PSIR are consistent with the Government's calculations.

### *Uncontested Issues*

Calculations regarding the Defendant's criminal history are not in dispute. The parties agree that the Defendant has one Criminal History Point and therefore falls within Criminal History Category I.

The parties further agree that for Defendant's conviction under 40 U.S.C. § 5104(e)(1)(A) the applicable Guidelines section is U.S.S.G. § 2K2.5: Possession of Firearm or Dangerous Weapon in Federal Facility; Possession or Discharge of Firearm in School Zone.

The parties also agree that the Base Offense Level is 6. *See* U.S.S.G. § 2K2.5(a). Both parties believe that no Specific Offense Characteristics under U.S.S.G. § 2K2.5(b) apply in this matter.

### *The Parties' Dispute*

The parties disagree as to whether the cross reference under U.S.S.G. § 2K2.5(c) applies to the Defendant's conviction. U.S.S.G. § 2K2.5(c) states as follows:

---

[1] The plea agreement identified the issue as contested by the parties. *See* ECF No. 49 at 3.

(1)     If the defendant used or possessed any firearm or dangerous weapon in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or dangerous weapon with knowledge or intent that it would be used or possessed in connection with another offense, apply –

     (A)     2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense if the resulting offense level is greater than that determined above[.]

Under U.S.S.G. § 2X1.1, the base offense level from the guideline for the substantive offense applies. While generally there is a three-level decrease for attempts under U.S.S.G. § 2X1.1(b)(1), the decrease does not apply "[w]hen an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section . . . . " U.S.S.G. § 2X1.1(c)(1).

The Government contends that, pursuant to U.S.S.G. § 2K2.5(c), there is an applicable cross reference to U.S.S.G. § 2K1.4 Arson; Property Damage by Use of Explosives. Specifically, the Government believes that U.S.S.G. § 2K1.4 (a)(1)(B) provides the applicable Base Offense Level because the Defendant's actions "involved the destruction or attempted destruction of a . . . government facility." The Defendant contends that the cross reference under U.S.S.G. § 2K2.5(c) does not apply because his conduct did not rise to the level of "attempted destruction of a government facility" as contemplated by the Guidelines.

### *Defendant's Calculations*

Thus, under the Defendant's calculations, the Defendant has an offense level of 6 pursuant to U.S.S.G. § 2K2.5(a). The Defendant would then receive a two-level reduction under U.S.S.G. § 3E1.1 for his acceptance of responsibility. Thus, with a Criminal History Category of I and an Offense Level of 4, the Guidelines sentencing range would be 0 to 6 months of imprisonment as argued by the Defendant.

### *Calculations of the Government and the PSIR*

The Government and the U.S. Probation Office calculate the Defendant's offense level as 21. PSIR at ¶ 81.

Under U.S.S.G. § 2K2.5(a), the Defendant's base offense level would be 6. None of the specific offense characteristics of U.S.S.G. § 2K2.5(b) appear to apply.

The Government contends that, because the Defendant possessed the flare gun in connection with an "attempt[] to damage or destroy, by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States," in violation of 18 U.S.C. § 844(f)(1), an offense which is covered by the guideline section U.S.S.G. § 2K1.4. Specifically, the base offense level of 24 under U.S.S.G. § 2K1.4(a)(1)(B) should apply, because the offense "involved the destruction of attempted destruction of . . . a state or government facility . . . or place of public use," *i.e.*, the United States Capitol. *Cf.* 18 U.S.C. §§ 2332f(e)(3) and (e)(6). No specific offense characteristic under U.S.S.G. § 2K1.4(b) appears to apply. Because U.S.S.G. § 2K1.4(a)(1)(B) expressly covers "attempted destruction," there is no three-level decrease under U.S.S.G. § 2X1.1(b)(1). *See* U.S.S.G. § 2X1.1(c)(1). The offense level of 24 under U.S.S.G. § 2K1.4 is therefore applicable because the resulting offense level is greater than the offense level under U.S.S.G. §§ 2K2.5(a) and (b). *See* U.S.S.G. § 2X1.1(c)(1). The Defendant would then receive a three-level reduction under U.S.S.G. § 3E1.1 for his acceptance of responsibility. Thus, with a Criminal History Category of I and an Offense Level of 21, the Guidelines sentencing range would be 37 to 46 months of imprisonment. *See* U.S.S.G. Ch. 5 Part A; *see also* PSIR at ¶ 81. Additionally, the PSIR reflects a Guidelines range of not more than three years of supervised release. *Id.* at ¶ 86.

**ARGUMENT AS TO APPLICABLE GUIDELINES**

The cross reference under U.S.S.G. § 2X1.1(c)(1) applies because the Defendant possessed the flare gun in connection with an "attempt[] to damage or destroy, by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States," in violation of 18 U.S.C. § 844(f)(1).

15

The circumstances of the offense make clear that the Defendant had the requisite state of mind and took substantial steps toward using the flare gun to start a fire that would have damaged the United States Capitol. Thus, his possession of the flare gun was "in connection with the commission or attempted commission of another offense," specifically, 18 U.S.C. § 844(f), which punishes "[w]however maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof . . . . " The elements of 18 U.S.C. § 844(f) are:

1. The defendant maliciously damaged, destroyed, or attempted to damage or destroy

2. A building, vehicle, or other personal or real property

3. By means of fire or an explosive

4. In whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof, or any institution or organization receiving Federal financial assistance

To that end, the Defendant entered the United States Capitol on November 5, 2024. At the time, the Defendant was in possession of not just the flare gun – which was loaded with a flare cannister, but also an accelerant (gasoline) that was secreted inside multiple inconspicuous containers, a lighter, as well as an Israeli flag that was tied to a shoe, indicating that it was likely intended to be used as a projectile. In addition, while he was in the security screening area, the Defendant made statements to a USCP police officer that he was there to "send a message to Congress" and the torch and flare gun were to "light up a message in fire." The Defendant later produced his political manifesto that he had hidden on his person titled "Project Phoenix, Spread the Flame, A New Dream: Waking Up to the American Nightmare, If the spirit of democracy is an individual's right to freely choose, then democracy is dead." Notably, a phoenix is a mythological bird that renews its life cycle through burning itself and then rising again from its

16

ashes.

While the Defendant told law enforcement officers after the fact that he merely intended to be arrested without actually carrying through with any arson, those statements are inconsistent with his behavior pre-arrest. The Defendant brought two containers of gasoline with him to the Capitol building in inconspicuous containers, rather than marked as recognizable containers of gasoline. When asked by officers what was in the containers, he lied and told them it was vodka. If the Defendant was merely trying to get the attention of officers, he would not have lied about the contents of the containers he carried with him. Nor did he have to bring multiple containers or conceal the gasoline in otherwise inconspicuous vessels. Similarly, the Defendant also did not disclose to officers the presence of the lighter or flare gun in his coat. The Defendant's obfuscation of the items he had with him when initially encountering law enforcement does not square with his statements that his *only* intention was to get arrested. Similarly, there was no need for the Defendant to bring multiple, alternative means of igniting the gasoline – the flare gun and the torch-lighter – if the Defendant did not actually intend to light it. Nor, for that matter, was there a need for the Defendant to have loaded the flare gun with a flare cannister in order to be arrested.

In addition, the Defendant's decision to place the flare gun in his coat pocket – where it was more likely to be readily accessible – rather than in his backpack suggests that he planned to discharge the flare gun. The fact that the Defendant chose to place a flare gun composed primarily of plastic (as opposed to metal) through an X-ray machine also undercuts his statement that he knew it would be detected by security. Further, the fact that the Defendant concealed his manifesto under his shirt indicates that he intended his message about "spreading the flame" to be concealed from law enforcement at the security screening, and only discovered later. In addition, the Israeli flag discovered was tied to a black shoe and stuffed into the Defendant's bag. There is no plausible

17

explanation for tying the flag to the shoe other than his intent to throw the shoe in some sort of demonstration.

Social media checks also indicated that the Defendant had posted a video on X.com on February 28, 2024 (https://x.com/prjct_phoenix/status/1762926399860376052) in which he discussed the self-immolation of Aaron Bushnell, who had self-immolated outside of the Israeli Embassy in Washington, D.C., "over protest of what's happening in Israel and Palestine right now." The Defendant's post included the text, "US Airman Aaron Bushnell lit himself on fire in protest of the genocide committed by Israel on the Palestinian people. Why? Because the US is deploying our OWN troops to assist Israel. His screams of 'Free Palestine' as his body burned will haunt our countries legacy forever." The Defendant appeared fascinated with what would motivate a person to self-immolate and mused that it must have been a choice between being complicit or committing suicide.

Testing at the ATF Fire Research Laboratory indicated that discharging the flare gun at a flag made of similar material and saturated with a similar amount of gasoline would have ignited the gasoline and caused a dangerous fire that could have damaged the building. Peak flame height of the ATF's testing showed that the flag covered in a similar amount of gasoline as the Defendant carried was approximately 11 feet, capable of causing damage to property and persons nearby. Similarly, an ATF test showed that the flare gun's projectile itself was capable of causing injury to individuals or property if discharged. In addition, the heat of the flare itself caused damage to the flooring of the ATF Fire Research Laboratory, apart from the area where the gasoline flames burned.

In summary, the nature of the items that the Defendant possessed, his decision to bring multiple inconspicuous bottles containing gasoline and then lie to officers about the contents of

his bottles, decision not to disclose the presence of the flare gun or torch, statements made prior to travel to D.C. and while in the Capitol about sending a message in fire – coupled with his phoenix imagery invoking rebirth through flame – demonstrate that he intended to set a fire that would have damaged parts of the United States Capitol and took substantial steps toward doing so. Therefore, the cross-reference of U.S.S.G. 2K2.5(c)(1)(A) applies and U.S.S.G. § 2K1.4(a)(1)(B) provides the appropriate offense level because, the Defendant's actions "involved the destruction or attempted destruction of a . . . government facility."

## THE GOVERNMENT'S SENTENCING RECOMMENDATION

The Government recommends that the Court sentence the Defendant to 46 months of imprisonment, followed by three years of supervised release with conditions including that the Defendant stay away from the District of Columbia, engage in mental health treatment, comply with any medication recommendations for mental health conditions, and engage in substance abuse testing and treatment. This sentence—the top of the Guidelines sentencing range—is necessary to reflect the serious nature of the offense and provide adequate deterrence to the Defendant and others in the community, particularly given the fear and disruption caused by the Defendant's conduct.

## I.     The Nature and Circumstances of the Defendant's Offense.

The nature and circumstances of the Defendant's offense were serious and incredibly dangerous. The Defendant attempted to smuggle a flare gun, lighter, and multiple containers of gasoline into the United States Capitol – where legislators, tourists, and others were crowded on Election Day. The evidence suggests that if USCP officers had not stopped and arrested the Defendant, he would have attempted discharge a flare gun inside the United States Capitol to ignite a gasoline-fueled fire. The Defendant was willing to risk grievous injury or death to all present merely to gain public attention for his political manifesto.

The Defendant's reckless behavior put countless lives at risk by attempting to engage in the inherently chaotic and dangerous act of arson. Fire is, by its very nature, unpredictable, and the Defendant's actions risked not just his own safety, but everyone in a crowded and important building. Once started, there is no telling the risk posed by an unexpected and uncontrolled fire in a building hundreds of years old that was built without the benefit of modern fire suppression systems – both to those present when the fire started and to first responders called to the scene.

Here, the Defendant drove overnight from his home in Michigan in possession of a flare gun and gasoline with the intent to enter a building housing a branch of government that was crowded, including with important government officials, on Election Day. He did so merely for the sake of publicity. In sum, this was a dangerous offense without any justification and merits a lengthy period of incarceration.

## II.    The History and Characteristics of the Defendant.

The Government is concerned that the Defendant appears unwilling to fully acknowledge the complete extent of his criminal conduct in this matter. The Defendant pleaded guilty to the sole charge of the Indictment, and the Government agrees that he should receive all applicable offense level decreases under U.S.S.G. § 3E1.1. However, his implausible denial of any intent to use the flare gun or gasoline reflects his unwillingness to confront and acknowledge the full scope of his criminal behavior. This demonstrates his continued danger to the community and supports a sentence toward the top of the Guidelines range.

In addition, as noted above, based on the location, the date, the documents he carried, and remarks he made to law enforcement, the Defendant appears to have been motivated by an intent to gain public attention for his political beliefs. But his willingness to engage in criminal behavior and risk serious danger to others in order to publicize his beliefs raises the concern that he would

be willing to engage in future criminal activity if he again believes it is politically expedient. Therefore, the Government believes that a substantial sentence is necessary to demonstrate to the Defendant that dangerous and unlawful behavior is not justified by an intent to spread a message.

The Government also notes that the PSIR indicates that the Defendant stated that he has never suffered from, been treated for, or been diagnosed with any mental or emotional health problems. *See* PSIR at ¶ 54. The Government is concerned because that is inconsistent with what the Defendant reported to law enforcement officers in his interview after his arrest. During that interview, the Defendant reported two mental health diagnoses and indicated that he had received prescriptions on separate occasions to treat two distinct mental health diagnoses. There is no indication in the PSIR that the Defendant engaged in any mental health assessment following the instant offense. Given the possibility that a mental health condition played some part in the Defendant's decision to engage in the instant offense, it is of concern that the Defendant appears either confused about or unwilling to confront any potential mental health issues. It is imperative that the Defendant must firmly confront his behavior, seek mental health evaluation and, if necessary, treatment, take medicine as recommended, and continue to engage with substance abuse treatment as needed to avoid further dangerous behavior.

### III.    The Need for the Sentence Imposed.

The requested sentence of 46 months is sufficient but not greater than necessary to meet the goals of sentencing.

The Government's recommended sentence reflects the seriousness of the Defendant's offense. Congress made clear that it recognizes the seriousness of the cross-referenced offense by imposing a mandatory minimum sentence of five years of imprisonment – even for cases involving only attempt. *See* U.S.C. § 844(f)(1). Because the Defendant pleaded guilty to 40 U.S.C.

21

§ 5104(e)(1)(A), he does not face any mandatory minimum, but the U.S. Sentencing Guidelines similarly conclude that attempted arson merits a stiff punishment, and the applicable section reflects an appropriately lengthy period of incarceration. Where, as here, the Defendant's conduct created risk of an accelerant-fueled fire to one of the most important and crowded federal buildings and all those inside, a sentence at the top of the guidelines range is appropriate.

In addition, the Defendant's behavior here – bringing a flare gun and gasoline to the United States Capitol – where laws are made – represents an egregious lack of respect for the law. The Defendant's decision to place lawmakers, their staff, tourists, and the general public at risk of fire merits a significant sentence.

The sentence also provides specific deterrence: it will ensure that the public is protected from the Defendant during his period of incarceration, and will discourage the Defendant from engaging in further dangerous criminal conduct for the sake of publicity. The sentence also provides general deterrence: it will signal to the community that traveling to the United States Capitol to engage in reckless and dangerous behavior there merely to garner public attention is a serious and unacceptable act. Such behavior has become increasingly common, (*see e.g.*, USCP Officers Stop & Arrest Man with Loaded Shotgun Outside the U.S. Capitol, Feb. 17, 2026, available at https://www.uscp.gov/media-center/press-releases/uscp-officers-stop-arrest-man-loaded-shotgun-outside-us-capitol; USCP Arrests Man Who Attempted to Light Car on Fire, Jan. 8, 2025, https://www.uscp.gov/media-center/press-releases/uscp-arrests-man-who-attempted-light-car-fire; Update: Checkpoint Attack, Apr. 6, 2021, available at https://www.uscp.gov/media-center/press-releases/checkpoint-attack-update), and a substantial sentence will hopefully deter others from doing so.

The requested sentence of 46 months incarceration – the top the applicable Guidelines

range – is a reasonable one.

## IV.    <u>The Need to Avoid Unwarranted Sentence Disparities</u>

As noted in the PSIR, the 70 defendants with the same Final Offense Level and Criminal History Category of I sentenced under U.S.S.G. § 2K1.4 who received a sentence of imprisonment received an average sentence of 41 months. *See* ¶ 102. The Government's recommended sentence is higher than the average, but not substantially so. And for the reasons set forth above, the Government believes a sentence slightly above the average is appropriate for the Defendant.

## <u>CONCLUSION</u>

For all the foregoing reasons, the Government respectfully requests that the Court impose a sentence of 46 months of incarceration, followed by three years of supervised release with conditions including that the Defendant be ordered to stay away from the District of Columbia, engage in mental health treatment, comply with any medications recommendation for mental health conditions, and engage in substance abuse testing and treatment.

Respectfully submitted,

Jeanine Ferris Pirro
United States Attorney

By: */s/ Brendan M. Horan*
Brendan M. Horan
Special Assistant United States Attorney
N.Y. Bar No. 5302294
601 D Street NW
Washington, DC 20579
(202) 730-6871
Brendan.Horan@usdoj.gov